UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                          :

KEITH B. MCFARLAND,                  :

                         Plaintiff,    :

                                   :         12 Civ. 2847 (JPO)

                -against-       :

                                   :        MEMORANDUM AND

LOAN CARE,                     :            ORDER

                        Defendant.  :

                                   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiff Keith McFarland alleges that Defendant Loan Care defrauded him in the course

of their dealings related to a loan modification.  Loan Care has moved for summary judgment.

For the reasons that follow, Loan Care's motion is granted.

**I.      Standard of Review**

       Summary judgment is appropriate in a case where the evidence, viewed in the light most

favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008).  The moving party bears the

burden of showing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986).  A fact is "material" only if it will affect the outcome of the suit

under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For there to

be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could

return a verdict for the nonmoving party."  *Id.*  In determining whether there is a genuine issue of

material fact, the Court must resolve all ambiguities and draw all permissible inferences in favor

of the non-moving party.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 83 (2d Cir. 2004).  "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."  *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) (citations omitted).  Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper.  *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996).  Although the nonmoving party can defeat summary judgment by presenting evidence sufficient to create a genuine issue of material fact, it is well established that "[m]ere speculation and conjecture [are] insufficient to preclude the granting of the motion."  *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

## II.      Jurisdiction

The Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332.  At all relevant times, McFarland has been a citizen of New York and FNF Servicing Inc., of which Loan Care is a division, has been incorporated and maintained its principal place of business in Virginia.  The diversity of citizenship requirement is therefore satisfied.  Because McFarland seeks damages in the amount of $239,500, the amount in controversy requirement of diversity jurisdiction is also satisfied.  This case was originally filed in the Supreme Court of the State of New York, County of Bronx, and Loan Care filed a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 in a timely fashion.  Accordingly, removal to this Court was proper.

## III.     Background

On April 20, 2009, McFarland purchased the premises known as 850 Home Street, Apartment 2E, Bronx, New York 10459 ("the Premises").  He obtained a mortgage in the amount of $235,063 from the Freedom Mortgage Company with an interest rate of five percent per year.  Under the terms of the mortgage, he owed $1,261.87 in monthly payments for

principal and interest, along with various escrow items that brought the total monthly payment to $1,518.70.  The loan was due May 1, 2039.

Whereas McFarland's 2008 tax return indicated an adjusted gross income of $79,448, this figure fell to $61,216 in 2009 and then increased to $61,929 in 2010.  Throughout this period, McFarland was employed at Madison Square Garden as a suite attendant and as a substitute teacher at PS 83; the bulk of his income was derived from his job at Madison Square Garden.

On June 12, 2010, McFarland filed for Chapter 13 bankruptcy with the United States Bankruptcy Court, Southern District of New York.  His petition listed assets totaling $217,965 and liabilities totaling $276,209.  His main asset, comprising $202,373 of his total assets, was the Premises.  McFarland recalls that he owed approximately $3,000 per month in debt at that time.  He explains that school budgets were slashed in 2009-2010, and that his gross income dropped by $20,000.  McFarland was represented by Daniel M. Katzner, an attorney, throughout his Chapter 13 bankruptcy proceedings.

In September 2010, McFarland was late in making his mortgage payment.  He made his last payment—a partial payment—in October 2010.  This payment was applied retroactively to his missed September payment.  McFarland explains that his situation had changed because of cutbacks in the hours he worked at both of his jobs, and that he saw no point to making payments after being threatened with foreclosure proceedings because "there was no sense in [him] throwing good money after bad."  McFarland's 2011 tax return indicated an adjusted gross income of $53,869.

On January 18, 2011, acting as "Servicer for Freedom Mortgage Co., a secured creditor of [McFarland]," Loan Care moved to lift the automatic stay imposed by 11 U.S.C. § 362(a) to allow Loan Care to enforce its rights to the Premises.

On May 9, 2011, with advice of counsel, McFarland filed a motion in the U.S. Bankruptcy Court requesting loss mitigation and agreeing to comply with the Loss Mitigation Procedures.  McFarland does not recall whether Katzner advised him regarding his legal rights and the bank's legal duties with respect to loan modification.  He does recall, however, that Katzner was a good and competent attorney.  On May 12, 2011, as part of bankruptcy proceedings, Loan Care received a loss mitigation request from McFarland.

On May 19, 2011, McFarland was approved by Loan Care for a loan modification.  This approval was memorialized in a letter to McFarland dated May 23, 2011.  That letter described an offer to reduce McFarland's monthly payments to $1,454.25, lower McFarland's interest rate to 4.750%, and extend the term of his loan to August 2041.

On June 15, 2011, the U.S. Bankruptcy Court entered a Loss-Mitigation Order directing McFarland and Loan Care to determine if there were any other options available to McFarland that would prevent the foreclosure of the Premises.  Loan Care's modification documents were reviewed again on June 22, 2011 and forwarded to Katzner around June 27, 2011.  McFarland rejected the offer on August 3, 2011, explaining that "this reduction was very small and will not be sufficient to allow [McFarland] to afford his monthly payments in the future."  In that letter, Katzner added that "[a]s a result, [McFarland] has decided to surrender the property back to Loancare [sic] in satisfaction of the secured debt unless a greater reduction can be offered."  Katzner did not indicate to McFarland any belief that McFarland had been wrongly denied a loan modification by Loan Care or that there were other programs for which McFarland was qualified that would result in a lesser or a greater loan modification.

On August 11, 2011, Judge Shelley C. Chapman issued an order lifting the automatic stay and permitting Loan Care to enforce its rights to the Premises.  McFarland learned that the stay was lifted when he spoke to a Loan Care representative.

On August 22, 2011, Loan Care denied a request from McFarland for Loss Mitigation Assistance because the proposed modified loan terms had not been approved by the U.S. Bankruptcy Court.  On August 23, 2011, acting through counsel, McFarland filed a motion in U.S. Bankruptcy Court to modify the confirmed Chapter 13 bankruptcy plan:

> [McFarland . . . respectfully moves this Court . . . for an order modifying the Debtor's confirmed Chapter 13 Plan so that the same provides for the surrender of the Debtor's primary residence located at 850 Home Street, Apartment 2B, Bronx, New York ("Premises") to the secured creditor, Loancare Servicing, Inc. ("Loancare") in full satisfaction of the secured debt . . . .

In that motion, McFarland acknowledged that he had lost his second job and that he had been unable to keep up on his mortgage payments.  In his deposition, McFarland states that he does not recall discussing with Katzner any surrender of the Premises as part of a loan modification. He adds that, notwithstanding Katzner's statements, it was his understanding at the time of his conversations with Loan Care that they were discussing a loan modification, not a deed-in-lieu.

On September 6, 2011, McFarland spoke with a Loan Care representative named Jennifer, who told him that he was no longer "cover/protected" by bankruptcy and that he would be able to get his loan modified.  On September 9, 2011, Cathy Jarboe, a Loss Mitigation Specialist at Loan Care, contacted Katzner to request certain information relevant to review of McFarland's request to surrender the property through a deed-in-lieu.  Katzner responded that McFarland "has nothing to gain by doing a deed in lieu of foreclosure," but mentioned that he had left a voicemail with McFarland.  He added "I expect our position will be if your client

5

wants to review the financial documents already on file and send us a deed in lieu, we will go

ahead and execute it as a courtesy.  Otherwise, we are not going to submit financial documents

when there is nothing to gain and your client will simply have to move forward with a

foreclosure action."

On September 13, 2011, Loan Care received a loss mitigation package from McFarland

that included documents requested in Jarboe's e-mail to Katzner with respect to a deed-in-lieu.

At that time, Loan Care processed McFarland's documents with the understanding that he was

willing to execute a deed-in-lieu, rather than with the understanding that McFarland sought a

loan modification.  Marcus Scott, a Loss Mitigation Team Lead at Loan Care, describes the

difference between these options:

> "Loss mitigation" includes various options such as forbearance,
> loan modification, short sale and deed-in-lieu.  The form of loss
> mitigation applied to each case depends on the borrower's
> delinquency, hardship and, if a borrower can no longer afford
> payments, the borrower's ability to sell or convey his house in lieu
> of foreclosure.  A deed-in-lieu is a form of loss mitigation which
> allows a qualified mortgagee to voluntarily deed the mortgaged
> property over in exchange for a release from all obligations under
> the mortgage, whereas a loan modification includes modifying the
> terms of the loan to make it more affordable.  As such, "loss
> mitigation" and "loan modification" are not synonymous.

On October 8, 2011, Loan Care wrote to McFarland and indicated that it required more

information to render a decision on his request for Loss Mitigation Assistance.  In that letter,

Loan Care stated: "We need to receive this information by 11/7/2011.  If we do not receive it by

that date, we will regrettably be unable to give further consideration to your request for Loss

Mitigation Assistance."  Among other things, Loan Care requested a "[l]etter requesting a [deed

in lieu]" and a "[p]rojected vacate day."  On October 13, 2011, Plaintiff submitted some

additional documentation, including a hardship letter, a NYC Property Information statement,

6

and a County Clerk's Office statement.  None of these documents is specifically limited to a request for loan modification; they may be necessary for a deed-in-lieu as well.

In November 2011, Chris Jonny conducted a physical appraisal of the Premises.  That appraisal was finalized in December 2011.  Loan Care had ordered the appraisal as part of its deed-in-lieu proceedings.  At the time of the appraisal, McFarland was under the impression that "the appraiser was coming to appraise the property to see how much the property [was] worth so that [Loan Care could] do a loan modification based upon what the property [was] worth then."

On January 6, 2012, Loan Care reviewed McFarland's loss mitigation package and discovered that it was missing a document.  That day, Loan Care contacted McFarland to request the relevant expense statement.

On February 15, 2012, Jarboe reviewed McFarland's documents.  She had been informed by Loan Care's bankruptcy department that McFarland had surrendered the Premises.  Jarboe therefore e-mailed McFarland: "I've been assigned to review your case for a deed-in-lieu of foreclosure . . . has the property been listed for sale, and have you had any offers[?]"  McFarland replied on February 16, 2012:  "I was under the impression that my loan was being modified.  All of the reps that I've been in contact with handled my paperwork as a loan modification.  I want to keep my property.  I recently faxed over papers (1/12/2012) to Ms. Valeria Umphlett for this purpose . . . I am very confused at this point."  Jarboe replied that same day and, attaching her exchange with Katzner, explained: "I received an email from your bankruptcy attorney that you had surrendered the property and [were] interested in pursuing a DIL.  He explained, the loan modification did not reduce your payment sufficiently enough to retain the property."  Jarboe then described the structure of a potential loan, noting that "the above calculations are only approximate numbers and are subject to change," and stated that "[i]f you would like to

7

continue down the loan modification path, I'll alert my supervisor and he can reassign to the loan

modification representative." McFarland sent this reply hours later:

> Ms Jarboe,
>
> My loan modification was being remodified once I came from under bankruptcy protection. I was told to submit an addendum hardship letter (see attached) and the other documents that were requested. I have submitted everything that was asked of me and kept in constant contact with Loan Care reps. The only phone calls that I received were from an automated system. I would promptly return the call to stay abreast of what was happening with my modification.
>
> This process was being treated differently from the one that was being handled with my bankruptcy lawyer. That one was rejected. My bankruptcy lawyer has nothing to do with this loan modification.
>
> Yes, I would most definitely like to continue down the modification path. I want to stay in my home. I have a job and I am able to pay something. As before, I am not able to pay the $1,476.34, but since I am gainfully employed, I am able to pay something manageable/reasonable based upon my income. The reason I applied for the modification is because of loss of income.
>
> Ms. Jarboe, if my paperwork is reviewed carefully, I know a positive outcome can be reached that will satisfy both parties . . . .

Jarboe replied just under an hour later to indicate that she would forward McFarland's e-mail to

her supervisor and request a continuous review towards a loan modification.

As a result of this exchange, McFarland's loss mitigation package was reassigned to Scott

to review for retention options. Scott called McFarland and, when McFarland indicated that he

was employed, Scott requested McFarland's last four paystubs. McFarland sent those documents

to Scott on February 17, 2012. McFarland's paystubs indicated that his income was $3,369.45

per month, and his expense reports claimed monthly expenses (other than mortgage payments) at

$1,558.01 per month.  In Scott's view, this left $1,811.44 for mortgage payments.  As a result, Loan Care offered McFarland a trial modification of $1,580.70 per month.

On February 18, 2012, Scott called McFarland to discuss the proposed modification. McFarland rejected it as unaffordable and so Loan Care sent McFarland a denial letter.  As McFarland recalls this conversation, Scott refused to consider a hardship letter, or the fact that McFarland's income was inconsistent, and then Scott ended the call mid-conversation.

In his deposition, McFarland states that he does not believe Loan Care unfairly received money from him.  He explains that the alleged fraud was committed by "the company overall," not just "one particular individual," and that Jarboe and Umphlett were the main individuals involved in the fraud.  In his view, Umphlett committed fraud by failing to respond to documents that McFarland sent her:

> Every time I sent her things or made phone calls, I never received any phone calls in return.  Only I received a letter in the mail saying that you have been denied because of a failure to respond properly, or you've been denied because you didn't act in a fashionable manner.  And I had already sent the papers via email, [fax], or however, and I was always getting a negative response.

As to Jarboe, he acknowledges that "I can't say that she did anything fraudulent to me . . . To my understanding, this was just thrown into her lap and she was trying to just settle it."  McFarland agrees that he wanted Loan Care to reduce his 30-year mortgage at $1523 per month to a 28-year mortgage at $670 per month; he believes that he was entitled to such a reduction pursuant to Loan Care's guidelines and his financial situation at the time of the events in question.

McFarland filed this suit on February 21, 2012.  Foreclosure proceedings were commenced on April 6, 2012.  The record does not disclose the status of those state court proceedings, which, in any event, do not bear on McFarland's fraud claim.

9

**IV.      Discussion**

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citation omitted).  The absence of any element defeats a fraud claim.

McFarland's fraud claim appears to rest on three grounds: (1) Loan Care promised to review his file for a loan modification, but instead processed it as a deed-in-lieu; (2) Loan Care allegedly misled McFarland as to the terms of a loan modification he could expect to receive; and (3) Loan Care did not properly evaluate McFarland's loan modification application.

The first ground cannot succeed because there is no evidence indicating that Loan Care misrepresented or omitted a material fact, or did so with knowledge of that fact's falsity, when it undertook review of McFarland's file.  Loan Care initially processed McFarland's file as a request for a loan modification, as evidenced by the fact that McFarland was sent offers that he ultimately rejected on August 3, 2011.  Then, in response to the order issued by Judge Chapman on August 11, 2011, McFarland's motion in U.S. Bankruptcy Court filed on August 23, 2011, and Katzner's statements to Jarboe, Loan Care appears to have switched course and started processing McFarland's documents as a request for a deed-in-lieu.  Immediately upon learning from McFarland that he did not wish to proceed with a deed-in-lieu arrangement, Jarboe clarified the misunderstanding, explained the basis for her prior belief to McFarland, and transferred McFarland's file to Scott, who undertook a loan modification analysis.  Within days of that clarification, Loan Care offered McFarland the very sort of loan modification he requested (though McFarland rejected it as too expensive).

10

Given that the "loss mitigation" program at Loan Care may include a deed-in-lieu or a loan modification, and that certain of McFarland's statements and representations in U.S. Bankruptcy Court could reasonably have been construed to mean that he sought a deed-in-lieu, the confusion on this point resulted from a genuine mistake.  There is no evidence that, at any point in this process, Loan Care knowingly made false statements to McFarland, or omitted material facts about the status of his loan application.  The evidence does suggest that Loan Care did not respond immediately to some of McFarland's inquiries, and that McFarland was strung along by the Loan Care bureaucracy for a period of time in early 2012, but such treatment does not constitute the basis of a fraud claim.  In any event, even if such evidence did exist, there is no evidence that McFarland justifiably relied on Loan Care's representations regarding the loss mitigation program to his detriment and thereby sustained injury.  He does not state, for instance, that he would have sought alternative loan modification deals in late 2011 or structured his finances in a different manner.  Because there is no evidence that McFarland took action, or remained inactive, as a result of a justifiable belief in Loan Care's statements, he cannot prove the requisite detrimental reliance.

The second ground falls for similar reasons: lack of misrepresentations, intent to deceive, and detrimental reliance.  Separate from its actual offers, all of which McFarland rejected, Loan Care did not make any promises to McFarland about the terms of a potential loan modification. Jarboe did provide McFarland with her estimate of what the terms of a final loan modification offer might be, but used heavily qualified language.  In any event, under New York law, "a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud." *Chase Investments, Ltd. v. Kent*, 256 A.D.2d 298, 299 (2d Dept. 1998).  McFarland apparently received materials from third parties indicating that

he could be eligible for monthly rates as low as $669, but those statements by third parties cannot support a fraud claim against Loan Care.[1]  By the same token, any information that McFarland may have received from third parties concerning the loan modification cannot support a fraud claim against Loan Care.  In any event, there is no evidence of detrimental reliance.

Finally, Loan Care did not commit fraud in its processing of McFarland's loan application by considering only his four most recent paystubs, an expense report prepared by McFarland, the status of McFarland's loan, and the applicable law.  Loan Care represented to McFarland that it would evaluate his application and explained how it would do so, and all of those statements were accurate.  To the extent that Loan Care departed from any representations about how it would conduct the evaluation, there is no evidence in the record indicating intent to defraud, nor is there any evidence of detrimental reliance.  Loan Care's denial of McFarland's preferred loan modification at the end of this evaluation process did not constitute fraud.

Ultimately, McFarland's case is grounded in his belief that Loan Care should have offered him a better loan modification package.  Loan Care was under no such obligation and did not commit fraud in declining to make such an offer.  Evaluating this record, no reasonable juror could conclude that Loan Care defrauded McFarland in their course of dealing.[2]

---

[1] Even if these materials had been sent to McFarland by Loan Care, they do not actually offer a loan modification.  Rather, one of them indicates that he "could" be eligible for a HUD housing program that "could" lower his payments, and the other used similarly qualified terms.  Accordingly, McFarland could not have justifiably relied on either of these documents in organizing his finances or defining his expectations of what Loan Care should have offered.

[2] To the extent that McFarland alleges a claim based in breach of a fiduciary duty, any such claim would fail because no fiduciary duty existed at the time of the negotiations between McFarland and Loan Care.  *See Fairfield Fin. Mortgage Grp., Inc. v. Luca*, No. 11 Civ. 3802, 2013 WL 656623, at *5 (E.D.N.Y. Feb. 21, 2013) ("A fiduciary relationship exists when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." (quotation marks and citations omitted)).

V.      **Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Dkt. No. 13 and to close this case.


SO ORDERED.


Dated: New York, New York
        May 29, 2013

_____
              J. PAUL OETKEN
          United States District Judge